2105 Everyday MD v. Facebook. It is an appeal from the District Court in the Central District of California. All right, Mr. Weier. Weier, yes. Five minutes for rebuttal. Yes, please. Good morning. May it please the court. I'd like to start off just by responding to some arguments made by Facebook in their appealee brief, in particular on page 29 where Facebook said, EveryMD does not assert, for example, that the off-the-shelf technologies recited in the claims are combined in a non-standard or inventive way or that the order combination otherwise provides some kind of technological advancement. This was decided on a motion for judgment on the pleadings, so the record before the court was just the intrinsic record. First, I'd like to point to the specification of the two patents themselves. They share the same specification. I'd like to start off with page 41 of the appendix, which contains the background of invention and summary of invention sections for the 192 patent. In the background of the invention, the specification points out the problems that existed in the Internet that were particular to the Internet in November 1999 at the time that this application was filed. Those problems included that it was difficult for people who wanted to communicate. You point to figure 2 of 192 as evidence that the patent teaches a specific structure for the invention. Figure 2 shows a home page. Can you point to any language from the claims that limits the invention to that particular structure? Yes, and that is in particular where it talks about... Give me that slide. Claim 1 of the 192 patent is set forth in column 14 on appendix 47. In particular, it's in the lines 23 to 29, where it sets forth the structure of the home pages that are allotted by the interface server. There it says set individual home page comprising information from said database associated with said individual member, a first control for submitting a comment about said individual member, and a second control separate from that first control for sending a message other than that comment to that individual member. Going back to figure 2, it's actually figure 9. It's not figure 2. I don't know where figure 2 was asserted, but figure 9 is the example of the web page that is created under the 192 patent. There, 910 is the information about the member. Item 920 is the second control for sending a message to a member. And item 925 is the first control for submitting a comment about a member. But Facebook argues that all of these individual things existed even in the computer environment before this point in time, including sending a computer message over a telephone line. So what about putting these components together makes this a novel and unconventional invention? I just would like to point out that the sending the message over the telephone, that's the 631 patent. It's not cited in the 192 patent. Absolutely, all of the individual components that are set forth in the claims were known in 1999. It's the combination of those elements that, for both inventions, made them both non-conventional and non-obvious. And in terms of, I'd just like to point out specifically an allegation made in the complaint with respect to the 192 patent, because admittedly the situation is less clear with respect to the 631 patent. In 1999, the concept of fields existed. And one of those fields that existed in 1999 was a field in which an individual could enter data. Absolutely. But what did not exist, and this again was a topic of the prosecution history, is combining these elements. Okay, there's two aspects. The claim talks about creating a set of consistent webpages for members of a group. So it's a plurality. So what it is, is for each member of this group, which is part of the claim, the webpage that is created has these features, these particular combination of features. And that combination of features did not exist anywhere else. The individual features did. The HTML tags obviously existed. That's how it was made. But putting them together in this form, and particularly creating a consistent set of those for a group of members, was something that didn't exist. But webpages existed. Oh, certainly webpages existed. And so what about the fact that you put addresses or phone numbers or background information regarding the person in a particular order makes this a new and novel invention? It's not the order of the invention. It's combining the data. Actually, it's the combining of both the first control for posting a comment and the second control for sending a message. Combining those things had not been done before because there was no belief that it served any intended purpose. But in this context, and this was 1999, before there was any social networking in any of that, we were setting this up to make it easier for people to communicate with and to talk about members of a group, in this case doctors. And so combining those two components on a webpage, both a post-comment control and a send-a-message control, provided, opened up means of communication that didn't exist before via these webpages. And doing it consistently for all the members of the group enhanced the communications ability with that particular group and between members of the group. How did that conceptually differ from the special interest group, SIG, chat rooms that existed in the 1980s in America Online? Conceptually or in particular? Conceptually. Well, conceptually, the chat groups, and that was especially for SIG, the people who used those were people who were adept and knowledgeable about the technology. They were mostly experts in that field. The whole purpose of this invention was to make it possible for people who had no idea about the Internet at that time. There were SIGs for poets and beer drinkers and beer makers. But just to be able to use it, to be online, there were those of those who were technologically savvy to be able to do that. And conceptually, and again, this goes back to idea versus implementation of an idea. The implementation used there was different than the implementation used here. And going back, and again, everybody is trying to figure out where this distinction is between an idea and an implementation of an idea. For example, in a non-computer context, an idea is a method for preventing a chair from tipping over when I lean backwards. That is an idea. It's too broad. It's not patentable. But then I say a method for preventing a chair from tipping over backwards by attaching two extra legs to the back of the chair. Now that, all of a sudden, becomes an implementation of an idea. It has a specific structure. It doesn't preempt all ways of preventing a chair from leaning over. It's just one particular way. Same thing here with the 192 patent. The district court held it's just talking about creating web pages for members. That is definitely its purpose. But it is not claiming all aspects of that. It is a particular type of web page that's created. The preemption component is not a substantial one. And when you're looking at the Mayo and the Step 2, what you're talking about is that is it novel, unconventional, was it known at the time? What is it about your mechanism for communicating among members by using web pages that wasn't known? First of all, I don't believe that it's necessary to go Step 2. I think that the main argument is that the claim is not just directed to an idea in the abstract. It's directed to a specific implementation of an idea. So the nonconventional and inventiveness doesn't apply if it passes Step 1. Under Step 2, it's the entire combination. Combining all those elements is new and has provided capabilities that didn't exist before. I did want to point out, and this is in the amended complaint itself, in Appendix 69, Paragraph 15. The claims of the 192 patent expressly include the limitations that distinguish over the prior art that the Federal Circuit held were missing from the claims of U.S. patent, the 122 patent, which was a grandfather patent under the broadest reasonable interpretation standard applicable during patent officer examination of the 122 patent. So here's a specific allegation that the 192 patent includes specifically the limitations that distinguish over the prior art. Again, at the time this amended complaint was filed, we haven't had more recent decisions of this Court that sort of clarified what kind of allegations, or including allegations of nonconventional within the complaint. You're into your rebuttal. I'm sorry. We'll ask them about Berkrammer and what we do about that. Okay. And then you can respond and reply. Yes. Why don't you start there, Ms. Keefe? Now you've got Berkrammer to deal with. I'm happy to deal with it, Your Honor. Okay. So I actually think that Berkrammer reiterates the ineligibility of these claims. As Your Honors are well aware, in Berkrammer there are two sets of claims. There was one set of claims that was found to still be ineligible, and there was another set of claims that perhaps had eligibility because within the claims themselves they called out the inventive step. One was storage and the idea that you weren't storing all this redundant information, and the storage of the non-redundant information allowed the computer to move faster and so improve the technology itself. Similarly, with the second set of dependent claims, there was something about one-to-one editing, which again improved the computer itself potentially by allowing for this specific type of editing. Those were in the claims themselves, and what the court found there was because potentially the inventive step was in the claim language, it was then up to the court to figure out whether or not, in fact, that was conventional. Nothing like that happens here. None of the claims. For one thing, we've actually never understood from appellant what the inventive step is. We're simply told it's the combination. When asked by the district court, what is your inventive feature, what is the inventive bit, Mr. Weyer read the entire claim into the record. There's never been an identification of something which is inventive. Instead, all of the elements are performed on generic computer components. Didn't he just say that the inventive aspect was the fact that it allows for this interactive communication? Well, interactive communication is not inventive. Interactive communication is simply the idea of having the ability to send a letter to someone or the ability to talk on the telephone. That's a problem that exists in humanity with humans. It's not a computer-related problem like DDR. It's not a technological improvement like EnFish or Bascom or anything of that nature. Instead, we're talking about a standard human problem of wanting to be able to communicate with people, potentially in two ways, and that's nothing different from, for example, appearing at the front desk of a hotel and saying, I'd like to leave a message for Mr. Meade so that he joins me for breakfast at 7 a.m. That's the first interface. The receptionist then writes the message down and potentially sends it up to the room and also calls Mr. Meade and leaves a message that says... and this improves that mechanism for communication. Couldn't that fall within our case law? No, Your Honor. The case law actually specifically calls out improving the technology itself, somehow improving the computer, not simply another way of doing something that was done off of the computer now onto a computer. The very notion that I can walk down every single element of the claims using the hotel analogy shows that this is an abstract idea that is then implemented on a computer. And the specification at issue here, the same specification for both, especially in column 12, starting at line 21 and extending all the way into column 13, spells out that this is all to be done on a general-purpose computer using general available materials and software. They specifically call out available Sun Microsystem Processors, Motorola. What's the status of the related IPR? The status of the related IPR? There are two related IPRs, and for the first related IPR, the 192 has been instituted and we're into the next process. And for the 631, the institution decision is due, I think, in two weeks. So we're right on the heels of that as well. But I think, Your Honors, that... Can you respond to a point that your friend made near the end about specific allegations in the complaint that he said called out a unique difference from the prior art? So what the complaint actually calls out, Your Honor, is simply the fact that it was allowed. The complaint is paragraph 15, which is in the appendix, I think it's 63, 69. Sorry, 69, Your Honor, and it's in paragraph 15. All that paragraph says is the claims included limitations that distinguish over the prior art. That's 102 and 103. 102 and 103 are not 101. So simply saying that my patent was issued because the Federal Circuit found that there were missing elements in another patent and mine now has those missing elements, that just means it's potentially novel or potentially non-obvious. That does not mean that it is eligible for patentability, and that's been squarely held by this Court in a numerous number of decisions, including the Ivey v. Symantec case at 838 F. 3rd, 1307, which specifically called out that the 102 and 103 arguments made by the appellant saying over and over how novel his claims were, were in fact irrelevant. That was the word used by this Court. And so that allegation in the complaint actually has no meaning here and therefore doesn't take it out either in the Atrix case, which most recently came down, or in Berkheimer to say now there's a question of fact and we need to go and deal with it. Instead, that's just an allegation regarding novelty or obviousness and has no place in this decision. So you're saying there was no actual allegation made anywhere before the District Court that this was not routine or conventional? That's correct, Your Honor. And in fact, the specification maintains over and over that these are conventional pieces of equipment used in conventional ways distinguishable from Bascom, for example, where in that ordered combination said, I'm going to stick the filter somewhere else. That's what makes this combination different from other combinations. That's not true here. In fact, the ordering of the steps has only to do with how the information comes in. For the second patent, the best analogy actually that I could come up with, and you can tell what's happening in my life right now, is for college students and how almost all college students have a chalkboard and a Post-it notepad on their door. The door is essentially the homepage that's recited in the claims. The front desk of the dormitory has a database, which is just a list of where all of the students live. For example, Ms. Keefe lives on the first floor in Freeman Hall at Wellesley.  And then the homepage is the front door of my dorm room, which shows 101. It shows my roommate, Dina. It shows my name. It has the chalkboard for a comment, something everyone else can see. And it has a piece of paper, the second interface, for writing a note that can be slipped under the door. That's a message. That is probably the most detailed analogy I've ever heard in this courtroom, but I get the point. Thank you. Well, Your Honor, I always try very hard to never use an analogy that someone can say you missed an entire element or you missed a step. And this one actually tracks all the way down if you follow it, again reiterating that this is a human problem simply put onto a computer. My learned opposing counsel also constantly talks about preemption, but as Your Honor is well known. It's irrelevant. Come again, Your Honor? I said it's irrelevant. Exactly, Your Honor. And I simply wanted to point out that the area was the case. Yeah. Thank you, Your Honor. I believe, Your Honor, that that's actually all I really had because there isn't, unlike almost all of the cases that have come down since November, so since these briefs were filed, all of those focus on an identified independent element of inventiveness and then looks to see is it in the claims and does it actually distinguish from a human problem that doesn't improve a computer, that doesn't exist here. We don't have any identified element. We simply have the argument over and over that it is this combination, but in no way does it tell us how. And similarly, using the two-way media case, we have to be told how in the claim itself, not simply that someone could figure out how to do it. Unless Your Honors have any other questions. No, thank you. I very much appreciate your time and interest. Thank you. First, I'd like to respond to my learned colleague's assertion that the improvement that's required is a technological improvement. I think DDR Holdings firmly set forth that an improvement in the problem that is unique to the Internet is sufficient. It doesn't have to change the way the computer itself works. It doesn't have to change the memory. It doesn't have to change the electrical machinery. Well, no, you're missing the point, I think, of Bascom and DDR. It's not just because you're doing this uniquely on the Internet that differentiates you. The question is you've seen that the way the Internet works, it doesn't work as well as it could, and you change something about the technology to allow that communication to occur differently. Well, I think in all respect, in DDR Holdings, the issue there was the claim was for a particular type of web page that was produced that had the same look and feel as a storefront. Yeah. And so the web page was produced with a particular look and feel. What was being produced is a type of web page. It was the method of doing it. Yes, and that's the same thing here. Allowing you to link over and then to be able to hold both open. Yes, and it did that by creating a web page that had the same look and feel. That was what was set forth in the claims. It was the technology for doing that. For keeping them both open on the screen. That technology was described in the specification, but it wasn't set forth in the claim, which is, again, what Malaria College talked here. Also, with respect to the comment that the inventive features are not set forth in the claims, they are, as I read for in the 192 patent, the specific combination of controls on the web page and creating a set of consistent web pages in that manner is expressly set forth in the claims. The other point was that my colleague said that there was no assertion made to the district court that there was inventiveness in the combination of elements in the claim. What she said was, were you the counsel below? Yes. That you simply read the entire claim? That was when the judge asked which part of the claim was inventive. As I explained, and going through the whole prosecution history of that patent, it is common in patent prosecution that in order to distinguish a claim over the prior art, you have to keep adding limitations until it does that. Then once that happens, it's the entire combination that becomes different from the prior art, operates differently. What the difference in standard is between inventiveness and non-obviousness is I don't understand. But if something is inventive or something, the non-inventiveness, I think the opposite is, is conventional and well-known. Conventional means not that it's obvious. Conventional means it actually exists, whereas obviousness says it doesn't exist, but it would still be obvious if somebody put it together. If it's not obvious, it can't be non-inventive, not logical. Say that again. If something is not obvious, that is, if the combination of elements is not obvious to put together, then that combination of elements must be inventive because otherwise, and it's certainly inventive if it didn't exist before. And so, thank you. Okay. Thank you. The cases will be submitted. The court is adjourned. All rise.